# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

KOTTKE CATTLE, LLC,
an Illinois Limited Liability Company,

    Plaintiff,

v.                                                                                   No.

ZIA AGRICULTURAL CONSULTING, LLC,
a New Mexico Limited Liability Company,
NARCISO PEREZ, and SEAN PEREZ,

    Defendants.

## KOTTKE CATTLE, LLC'S VERIFIED COMPLAINT
## FOR BREACH OF CONTRACT, BREACH OF THE DUTY OF GOOD FAITH
## AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, FRAUDULENT
## MISREPRESENTATION, CONVERSION, EMBEZZLEMENT, UNJUST
## ENRICHMENT, ACCOUNTING, DECLARATORY JUDGMENT, AND INJUNCTION

    Kottke Cattle, LLC ("Kottke"), by and through its attorneys, BUSINESS LAW SOUTHWEST LLC (Donald F. Kochersberger III and Alicia M. McConnell), states as follows for its Verified Complaint for Breach of Contract, Breach of the Duty of Good Faith and Fair Dealing, Breach of Fiduciary Duty, Fraudulent Misrepresentation, Conversion, Embezzlement, Unjust Enrichment, Accounting, Declaratory Judgment, and Injunction.

### PARTIES AND JURISDICTION

1. Plaintiff Kottke is an Illinois foreign limited liability company.

2. Members of Kottke are residents of the States of Illinois and Oklahoma.

3. Defendant, Zia Agricultural Consulting, LLC ("Zia"), is a New Mexico Limited Liability Company, registered in, authorized to, and doing business in, New Mexico, and its members are residents of the State of New Mexico.

4. Defendant Narciso Perez is a resident of the State of New Mexico.

5. Defendant Sean Perez is a resident of the State of New Mexico.

6. The amount in controversy exceeds $75,000.00 as more completely described herein.

7. This court has jurisdiction pursuant to 28 U.S.C. § 1332(a). The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and Plaintiff and Defendants are citizens of different states.

8. This action is governed by the laws of the State of New Mexico.

## FACTS

9. Zia markets and services various investments in livestock.

10. In or about 2013, Zia and its representative Narciso Perez ("Narciso") met the owners of Kottke and began offering investment opportunities in cattle to Kottke.

11. Narciso represented himself as being associated with Zia and specifically as the individual with special relationships in the cattle industry that were being leveraged by Zia for favorable cattle investment terms.

12. Narciso introduced the owners of Kottke to his son, Sean Perez ("Sean" herein), and Narciso and Sean informed Kottke that Sean was the sole owner/member of Zia.

13. The parties have engaged in a series of transactions over time, all of which involved Kottke purchasing cattle and Zia caring for the cattle until the investment could be realized (through sale of calves, adult cows/bulls, or otherwise).

14. Initially, the investments returned expected values and Zia appeared to properly account for Kottke's inventory.

15. During the course of later transactions, however, Zia has repeatedly and consistently failed to account for the production of the investments, allowed/caused unnecessary losses,

overcharged Kottke for Zia's services and pass-through expenses, and refused/failed to pay Kottke for investment income realized.

16. The wrongful acts by Defendants include, but are not limited to:

    a. The "Mexford" Program

        i. In 2019, Kottke paid Zia approximately $1.5M for an investment in 2,004 head of cattle ("HD").

        ii. In addition, it paid Zia more than $400k in various charges for services related to the 2,004 HD.

        iii. The deal was structured such that, when the cows were ultimately sold, Zia would receive 20% of the profits and Kottke would receive the remaining amount.

        iv. For Mexford, Kottke purchased cattle that were fed on pasture and Zia would bill Kottke for the pasture charges.

        v. Once Mexford cattle were ready to go to a feed yard, Zia agreed to purchase the cattle from Kottke according to an agreed pricing scheme, which was based on the cattle weight and other factors.

        vi. The Mexford cattle proceeded along this path, including being sent to the feed yard, sold to packers, and paid out to Zia by the feed yard.

        vii. To date, however, Zia has only accounted for the sale of 420 HD, and fails/refuses to account for the sale of the remaining 1,584 HD.

        viii. In early 2021, Glen Kottke contacted Mike Rogers, who was an inventory manager for Zia whose job description including keeping the inventory of

        all livestock Zia managed, to ask about the whereabouts of the Mexford cattle, which he expected to still be on pasture.

    ix.  Mr. Kottke learned that the Mexford cattle, however, had actually been sold approximately a year prior.

    x.  This has resulted in a loss to Kottke of more than $1.5M.

b. The "GY1" Program

    i.  Also in 2019, Kottke paid Zia approximately $1.2M for an investment in 1,541 HD.

    ii.  Kottke advanced these funds to Zia under the condition that Zia would pay Kottke its proceeds from the Mexford Program by year's end.

    iii.  Because Zia failed to meet this condition, Kottke was forced to divert funds from other productive areas to cover the $1.2M.

    iv.  The deal was otherwise structured substantially similar to ¶16(a), above.

    v.  While all of these animals are also believed to have been sold, Zia fails/refuses to account for any/all of them.

    vi.  This has resulted in the total loss of Kottke's $1.2M investment, plus any gains realized therefrom.

c. The "Source 2" Program

    i.  The Source 2 program involved Zia: 1) purchasing cattle for Kottke exclusively from the Milk Source Dairy, which were supposed to be of a specific breed and quality; 2) feeding them at a feed lot called Heifer Source located in Liberal, Kansas that was privately owned by Milk Source Dairy for an agreed price to feed the cattle to sale weight (this cost structure is

      known as "cost of gain" in the industry); and 3) arranging to sell them to packers.

  ii. In 2020, Kottke paid to Zia more than $1.8M for an investment in more than 2,000 HD for Source 2.

 iii. Zia made multiple misrepresentations in the course of this investment.

 iv. Zia represented that Kottke was investing entirely in NHTC certified (for which a premium price is earned when sold) Holstein/Angus calves from the Milk Source Dairy in Wisconsin.

  v. All of the animals were to be created by artificial insemination using semen paid for by Kottke and shipped to Milk Source Dairy.

 vi. Initially, Zia purchased some Source 2 cattle from Milk Source Dairy and sent them to Heifer Source, as planned.

vii. However, Zia eventually ceased purchasing the cattle from Milk Source and instead started purchasing inferior cattle from other locations, and sending them to a different feed lot, Beef City, while nonetheless attributing them to Kottke's Source 2 inventory.

viii. Only 247 HD originated from Milk Source Dairy, as represented by Zia.

 ix. Another 1,853 HD were secretly instead purchased from Mellencamp Dairy in Idaho, and 216 HD from Ponderosa Dairy in Idaho.

  x. The 1,853 HD from Mellencamp Dairy were inferior Jersey/Angus calves.

 xi. None of the Idaho animals appear to have resulted from the semen shipped to Milk Source.

    xii. Kottke paid Zia for the purchase of cattle as if all were NHTC certified Holstein/Angus calves from the Milk Source Dairy in Wisconsin.

    xiii. Once the cattle were at Beef City, Zia borrowed against the entire value of the cattle (and kept these funds) and financed the cattle's feed, meaning that when the cattle were sold, the proceeds first went to repaying the amount financed, which was nearly the entirety of the cattle's value, with any remaining profit also going to Zia.

    xiv. Glen Kottke contacted Rogers to ask about the location of these cattle, and he relayed to Rogers that Narciso Perez told Kottke they were in Texas.

    xv. Rogers informed Glen Kottke that there were no cattle in Texas.

    xvi. Most egregiously, Zia has not paid Kottke anything for the disposition of these animals, although they did provide one credit of $98k during the course of the investment.

    xvii. This has resulted in a loss to Kottke of more than $1.7M from the original investment, plus any gains realized therefrom.

d. The "Clovis 1 Program":

    i. This was a "Beef on Dairy" program whereby Zia was to send semen to the Clovis Dairy in New Mexico.

    ii. Cows at dairy were to receive artificial insemination of semen, and their offspring would then belong to Kottke and raised as beef animals.

    iii. In February, 2019, Zia billed Kottke for semen costs and freight for 6 months of semen shipments (June – December) for a total of $109,375, which Kottke paid to Zia.

      iv.  No cattle ever resulted from Clovis 1 and entered Kottke Cattle inventory.

      v.  By late 2019 and early 2020, Kottke learned that its calf inventory at Clovis Dairy was zero, despite the fact that all semen was shipped.

      vi.  Kottke paid Zia for the semen and, despite numerous promises to do so, Zia continues to refuse/fail to provide any details about the disposition of the semen.

      vii.  This has resulted in a loss to Kottke of nearly $110k.

e.  The "Calf Programs"

      i.  The Calf program(s) involved cows initially purchased for Kottke by Zia in 2014, which were bred for the sale of calves.

      ii.  Each year, the Calf program(s) would yield a crop of calves, which would be initially sent to pasture.

      iii.  Zia would arrange for the pasture and charge Kottke a set fee for feeding the calves while on pasture.

      iv.  Once the calves were ready to go to a feed yard, Zia would coordinate an arrangement where Kottke contracted directly with the feed yard to feed out the calves and then sell them to packers.

      v.  Rogers would track the calves as they proceeded through this process, including keeping track of their location and arranging for the packers to purchase them when finished at the feed lot.

      vi.  When the 2019 calf crop was sent to the feed lot, specifically Beef City feed lot, Rogers was told that they were now Narciso Perez's personal property.

vii. Narciso Perez claimed to Rogers and Beef City that he purchased the calves from Kottke.

viii. Rogers told Sean Perez and Narciso Perez that this claimed sale needed to be properly documented, as Zia's inventory still reflected the cattle as belonging to Kottke, and there were no documents to memorialize the purported sale from Kottke to Zia or Narciso Perez.

ix. Sean Perez ignored Rogers' concerns and continued to simply insist that the calves now belonged to Narciso Perez and that he was not going to "get in the middle" of the deal.

x. Beef City refused to record these calves as belonging to Kottke, because Narciso had stated that they were his, and later claimed it was not able to treat the animals as owned by Kottke both because the animals were branded with Zia's brand and because Kottke had not filed a lien.

xi. Ultimately, Narciso Perez had immediately borrowed against the entire value of the calves (and kept the funds) and financed the feeding of the calves in his own name when they arrived at Beef City.

xii. Thus, when the calves were eventually sold, the financed amount was repaid, and the profits also went directly to Narciso Perez.

xiii. Kottke was unaware of this theft until spring of 2021, at which time Narciso Perez admitted to Neal Kottke on a telephone call that he took the entire crop, and promised that he will "make it good" with Kottke (which he never did).

xiv. Kottke never agreed to sell these calves to Narciso Perez, Narciso Perez has never paid Kottke for these calves, and it is believed that Zia's inventory still records the animals as belonging to Kottke.

xv. Kottke has learned that, as a result of these apparent misdeeds by Zia, as well as others of which Rogers was personally aware, and in light of Sean Perez's inability/unwillingness to provide any plausible innocent explanation, Rogers could no longer in good conscience continue with his employment, and he resigned his position with Zia on August 31, 2021.

xvi. One crop of calves remains in progress, consequently those calves and the remaining original cows that birthed them remain in Zia's possession, which is discussed more fully below.

xvii. Zia has embezzled money from these programs in at least three ways.

1. First, upon information and belief, Zia misrepresents the number of calves produced, thereby keeping the proceeds from the sale of those calves for which they never accounted.

2. Second, the periodic accounting for each crop shows a consistent unexplained decline in the number of calves, with the proceeds from the "missing" calves, if any, going to Zia.

3. Third, and most shockingly, Defendant Narciso Perez personally converted the proceeds generated by the entire 2019 batch of calves, as described above.

xviii. The total loss by Kottke for this series of investments is currently unknown, however, Zia/Narciso's theft of the 2019 calves alone resulted in a loss of approximately $900,00.00.

17. With respect to the cows/calves remaining in Zia's possession that are at issue in this case, Kottke purchased all of the cows from Zia as described in ¶16(e) and the majority have yielded calves within the past year that remain with the cows.

18. These cattle and calves are kept on various pasture locations throughout Northeastern New Mexico.

19. Zia arranged for the feeding and care and breeding of the cattle on behalf of Kottke, and Kottke agreed to pay Zia for the necessary expenses related to the feeding and care and breeding of its cattle.

20. In the months of November 2020 through August 2021, Zia provided invoices to Kottke reflecting a total amount due for the care and maintenance of these animals to be $651,390.18.

21. Thereafter, when Kottke requested an updated account statement from Zia, the amount claimed by Zia for these same months had increased dramatically.

22. The new statement differed from those originally provided to Kotke in two ways. First, Zia adjusted the December amounts for the sale of culled cows and reduced the original due. Second, Zia added questionable charges from old dates at feed lots (dates as old as 2018) and claimed those are now owed as well.

23. Kottke had never seen these charges before, and the charges did not appear on any bill or statement for the preceding three (3) years.

24. The statements show that Zia added claims for expenses from as far back as 2018 that had not appeared on their original invoices.

25. The difference between the charges allegedly owed by Kottke initially and the charges on the newer statement totaled $480,359.09.

26. As a result of this inconsistent and seemingly fraudulent billing, Kottke decided that it would prefer not to have Zia continue to care for its cattle.

27. Kottke reached out to Zia to arrange for the relocation of Kottke's cattle.

28. Zia initially failed/refused to respond to Kottke regarding its request to retrieve its cattle and has refused and failed to account for any/all of the cattle and offspring owned by Kottke.

29. Then, on or about August 23, 2021, Zia, through counsel, asserted that Kottke owed Zia $838,528.72 for the care and feeding of the animals identified in ¶17, above.

30. In that same letter, and despite the fact that Zia actually owes Kottke far more than $838,528.72, Zia purported to possess an agister's lien on the animals and notified Kottke that it will publish a notice of sale to facilitate the sale of the animals.

31. On or about August 27, 2021, Kottke responded to Zia's letter by disputing the existence of any amounts owed by Kottke to Zia, and asserting that, therefore, the claimed lien was entirely without basis.  Kottke also demanded an accounting of the parties' investment activities.

32. On or about September 15, 2021, Zia sent to Kottke a periodic invoice for the care and maintenance of the same animals, showing that the amount due was $603,486.02.

33.  Nonetheless, and without providing any additional information, on or about September 28, 2021, Zia sent to Kottke a purported Notice of Sale asserting that the animals would be

sold by auction on October 28, 2021. On October 15, 2021, Zia sent an Amended Notice of Sale (Exhibits A and B, attached, collectively the "Notice").

34. The Notice further described various amounts that Zia claims Kottke owes, including the same $838,528.72 previously claimed, plus $66,378.40 in costs accrued since July 31, 2021, as well as unknown amounts for attorney's fees, costs and ongoing expenses.

35. On or about September 30, 2021, Kottke again informed Zia that it was wrongfully claiming the amounts owed, improperly asserting an agister's lien, and intending to illegally sell Kottke's property.

36. In the same letter, Kottke sought a potential compromise, again asked Zia to provide an accounting of the parties' investment activities, and noted the seeming dispute between the amounts Zia claims Kottke owes it (see ¶32 and ¶34, above).

37. Zia responded, on or about October 5, 2021, by reasserting that it was entitled to a lien and would proceed with sale, as noticed.  At the same time, Zia responded to the curiosity of the wildly differing amounts it claims Kottke owes it by asserting that it is explained by Zia offsetting the claimed amount by "other funds held by Zia for Kottke".

38. Accordingly, it appears that Zia holds $235,042.70 (the difference between the amount in ¶32 and ¶34) of Kottke's funds from an unknown source, for an unknown period of time, and despite not having any authorization from Kottke to "hold" any of their funds.

39. Sale by auction of all of these animals is not a commercially appropriate manner of sale, and is certain to result in a lower price for the animals than would be achieved by Kottke if allowed to negotiate with potential buyers of its animals

40. As a result of the foregoing, a dispute has clearly arisen between Zia and Kottke regarding the sale of cattle owned by Kottke and Zia's accounting of the amounts it claims are due from Kottke.

### COUNT I – BREACH OF CONTRACT

41. Plaintiff realleges the allegations contained in Paragraphs 1 through 40.

42. Kottke had valid agreements with Defendants with respect to each of the five (5) Programs described herein.

43. Kottke performed all of its obligations under these agreements.

44. Defendants materially breached their agreements with Kottke, as more fully described above.

45. Defendants' actions were malicious, willful, reckless, wanton, fraudulent, or in bad faith.

46. Kottke has been damaged as a direct and proximate result of Defendants' breach(es).

### COUNT II - BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

47. Plaintiff realleges the allegations contained in Paragraphs 1 through 46.

48. There were contractual agreements among Defendants and Kottke with respect to each of the five (5) Programs described herein.

49. Defendants owed Kottke a duty of good faith and fair dealing in all of their dealings with Kottke.

50. Defendants breached their duty of good faith and fair dealing to Kottke, as more fully described above.

51. Kottke has been damaged as a result of Defendants' conduct.

52. Defendants' actions were willful, malicious, reckless, fraudulent, or in bad faith.

### COUNT III - BREACH OF FIDUCIARY DUTY

53. Plaintiff realleges the allegations contained in Paragraphs 1 through 52.

54. As investment advisors, Defendants owed a fiduciary duty to Kottke.

55. Defendants breached their fiduciary duty to Kottke, as more fully described above.

56. Kottke has been damaged as a result of Defendants' conduct.

57. Defendants' actions were willful, malicious, reckless, fraudulent, or in bad faith.

## COUNT IV - FRAUDULENT MISREPRESENTATION

58. Plaintiff realleges the allegations contained in Paragraphs 1 through 57.

59. Defendants made representations of fact to Kottke which were not true, including (but necessarily limited to) specifically:

    a. That they had an unblemished history of profitable cattle investing;

    b. That they possessed special relationships in the cattle industry that they would leverage for favorable cattle investment terms for Kottke;

    c. That they would always act in the best interests of Kottke's investments;

    d. That they would always keep Kottke informed of the status of its investments;

    e. That they would promptly pay Kottke its earnings from the investments;

    f. That the investments were performing well and in accordance with the agreed terms;

    g. That invoices provided to Kottke contained an accurate accounting of the costs incurred by Kottke and proceeds received by Zia for Kottke.

60. Defendants also intentionally omitted material information necessary to maintain the truth of their other representations.

61. Defendants either knew the falsity of the representations or they made them recklessly.

62. Defendants knew, or should have known absent their recklessness, that their material omissions also rendered their previous statements false.

63. Defendants made the representations with the intent to deceive and to induce Kottke to rely on the representations.

64. Kottke reasonably relied on Defendants' representations.

65. Kottke has been damaged as a result of his reliance on Defendants' representations.

66. Defendants' actions were willful, malicious, reckless, fraudulent, or in bad faith.

## COUNT V - CONVERSION

67. Plaintiff realleges the allegations contained in Paragraphs 1 through 66.

68. Defendants continue to unlawfully exercise dominion and control over Kottke's property, specifically its cattle.

69. Defendants' unlawful exercise of dominion and control over Kottke's cattle is in exclusion or defiance of Kottke's rights.

70. Defendants' acts as described above constitute an unauthorized and injurious use of Kottke's property.

71. Kottke has demanded that Defendants return all of its cattle.

72. Defendants have refused to return Kottke's cattle and have instead threatened to sell Kottke's cattle at auction.

73. Kottke has been damaged as a result of Defendants' wrongful detention of its cattle.

74. Defendants' actions were willful, malicious, reckless, fraudulent, or in bad faith.

## COUNT VI - EMBEZZLEMENT

75. Plaintiff realleges the allegations contained in Paragraphs 1 through 74.

76. Kottke entrusted its money to Defendants, as more fully described above.

77. Defendants fraudulently appropriated Kottke's money by using or consuming it for a purpose other than that for which it entrusted it to Defendants.

78. Kottke has been damaged as a result of Defendants' conduct.

79. Defendants' actions were willful, malicious, reckless, fraudulent, or in bad faith.

## COUNT VII - UNJUST ENRICHMENT

80. Plaintiff realleges the allegations contained in Paragraphs 1 through 79.

81. By taking its money and providing nothing of value in return, Defendants have knowingly benefitted at Kottke's expense.

82. Allowing Defendants to retain the benefits obtained at Kottke's expense would be unjust.

83. Kottke has been damaged as a result of Defendants' conduct.

84. Defendants' actions were willful, malicious, reckless, fraudulent, or in bad faith.

## COUNT VIII - ACCOUNTING

85. Plaintiff realleges the allegations contained in Paragraphs 1 through 84.

86. As managers of Kottke's money and assets in the Programs described above, Defendants owe Kottke a duty to account for all of the activities and finances of the Programs.

87. Defendants have sole access and control over the accounting of the activities and finances of each of the Programs.

88. Defendants have refused to provide the accounting to which Kottke is entitled.

89. The Court should therefore order complete accountings of each of the Programs and all of their activities and finances.

## COUNT IX - DECLARATORY JUDGMENT

90. Plaintiff realleges the allegations contained in Paragraphs 1 through 89.

91. While the exact amount remains elusive, Zia claims that Kottke owes it at least $603,486.02 (the amount of the September 15, 2021, invoice), and as much as $904,907.12 (the aggregate total contained in the Notice).

92. Zia also claimed (in the Notice) that the daily cost of care and maintenance of the remaining animals is $1.90 per head of cattle, or $1,506.60 per day on a total of 794 heads of cattle, with these charged presumably accruing starting on the date of the Notice, September 28, 2021.

93. Kottke disputes the validity of the fees charged/claimed by Zia, and Kottke asserts that it is instead owed significant amounts owing from Zia.

94. An actual controversy exists over the parties' rights and obligations regarding the amounts owed in this case.

95. The parties must resolve this dispute to determine their rights and responsibilities with respect to the amounts claimed.

## COUNT X – INJUNCTIVE RELIEF

96. Plaintiff realleges the allegations contained in Paragraphs 1 through 95.

97. Zia currently has possession of cattle owned by Kottke.

98. Kottke has rights in need of protection, including recovering possession and control of the cattle that it owns and to which it is entitled.

99. If Defendants are not enjoined, Kottke will continue to suffer immediate and irreparable harm, both in the form of inflated/fraudulent billing claims by Zia, and because Zia refuses to account for the cattle owned by Kottke.

100.    If Defendants are not enjoined, Kottke will be unable to ensure that Zia will not sell or otherwise dispose of Kottke's cattle or that Zia will acknowledge and/or properly credit Kottke for any offspring that are born to the cattle (and are therefore the property of Kottke).

101.    The cattle at issue are a perishable product, the value of which can also fluctuate

greatly over time, meaning that in the absence of injunctive relief, Kottke may be irreparably harmed by complete loss, or unquantifiable diminution, of the cattle's value.

102.     Injunctive relief is necessary to protect Kottke's rights during and after this litigation.

103.     The balance of equities weighs in favor of injunctive relief against Defendants.

104.     This harm to Kottke will not be prevented until the Court enters an injunction ordering Defendants to transfer possession of the cattle to Kottke.

105.     Because Kottke is willing to deposit the full amount claimed by Zia in the Court Registry so that it may retrieve and relocate its cattle pending the Court's resolution of the actual amount due to Zia, if any, Zia will not be prejudiced by the granting of its requested injunctive relief.

106.     Under these circumstances, Kottke is entitled to the injunctive relief it seeks.

WHEREFORE, Kottke respectfully requests that this Court grant judgment in its favor and against Defendants, order an accounting, award damages in an amount to be proven at trial, plus punitive damages, costs and reasonable attorney's fees, along with pre- and post-judgment interest at the maximum rate allowed by law, enter an order permitting Kottke to retrieve and relocate its cattle and prohibiting Zia from interfering with Kottke's relocation of its cattle,  and for such other and further relief that the Court deems just.

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff also hereby demands a trial by jury in this matter.

Respectfully Submitted,

BUSINESS LAW SOUTHWEST LLC

 ***/s/ Donald F. Kochersberger III***
Donald F. Kochersberger III
Alicia M. McConnell
320 Gold Ave SW, Ste. 610
Albuquerque, NM 87102-3299
505-848-8581
Donald@businesslawsw.com
Alicia@businesslawsw.com

*Attorneys for Plaintiff Kottke Cattle, LLC*