**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

KOTTKE CATTLE, LLC, an Illinois
Limited Liability Company,

      Plaintiff,

vs.

                                    No. CIV 21-1004 JB

ZIA AGRICULTURAL CONSULTING,
LLC, a New Mexico Limited Liability
Company; NARCISO PEREZ and SEAN
PEREZ,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction, filed October 15, 2021 (Doc 2 (Ex Parte))("TRO Motion").  The primary issue is whether, pursuant to rule 65(b)(1) of the Federal Rules of Civil Procedure, the Court should grant Plaintiff Kottke Cattle, LLC's, request for an ex parte temporary restraining order ("TRO") enjoining Defendants Zia Agricultural Consulting, LLC ("Zia Agricultural"), Narciso Perez, and Sean Perez, from interfering with Kottke Cattle's recovery of its cattle, or selling Kottke Cattle's livestock at auction on October 28, 2021, until the Court holds a hearing and rules on Kottke Cattle's application for a preliminary injunction ("PI"). Because Kottke Cattle does not show that damages would be an inadequate remedy or that it will suffer irreparable harm if the Court does not issue a TRO, and because Kottke Cattle has not shown a substantial likelihood that it will succeed on the merits of its claims, the Court will deny Kottke Cattle's request for a TRO.

## FINDINGS OF FACT

The Court takes its facts from the Plaintiff's Verified Complaint for Breach of Contract,

Breach of the Duty of Good Faith and Fair Dealing, Breach of Fiduciary Duty, Fraudulent Misrepresentation, Conversion, Embezzlement, Unjust Enrichment, Accounting, Declaratory Judgement, and Injunction, filed October 15, 2021 (Doc. 1)("Complaint").  Because there has been no hearing on the TRO, the Court can take its facts only from the Complaint. "A temporary restraining order requires the Court to make predictions about the plaintiff's likelihood of success." Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1179 (D.N.M. 2011)(Browning, J.).  Rule 52 of the Federal Rules of Civil Procedure states: "In granting or refusing an interlocutory injunction, the court must . . . state the findings and conclusions that support its action."  Fed. R. Civ. P. 52(a)(2).  "'[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'"  Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1179 (quoting Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009))(alteration in Herrera v. Santa Fe Public Schools only).  See Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."); Firebird Structures, LCC v. United Bhd. of Carpenters and Joiners of Am., Local Union No. 1505, 252 F. Supp. 3d 1132, 1140 (D.N.M. 2017)(Browning, J.).

The United States Court of Appeals for the Tenth Circuit notes "that when a district court holds a hearing on a motion for preliminary injunction it is not conducting a trial on the merits." Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003).  Moreover, "[t]he Federal Rules of Evidence do not apply to preliminary injunction hearings."  Heideman v. S. Salt Lake City, 348 F.3d at 1188.  Thus, while the Court does the best it can to make accurate findings from the record that it has, and in the short time that it has to make findings, these findings of fact are relevant only for the purpose of determining whether to issue a TRO and do not bind the Court or

the parties at trial.  Accordingly, the Court finds as follows:

     **1.**    <u>**The Parties**</u>.

     1.    Kottke Cattle is an Illinois limited liability company.  <u>See</u> Complaint ¶ 1, at 1.

     2.    Kottke Cattle's members are residents of Illinois and Oklahoma.  <u>See</u> Complaint ¶ 2, at 1.

     3.    Glen Kottke is the manager of Kottke Cattle.  <u>See</u> Plaintiff's Verification, filed October 18, 2021 (Doc. 5).

     4.    Zia Agricultural is a New Mexico limited liability company "registered in, authorized to, and doing business in, New Mexico,"  Complaint ¶ 3, at 1, which "markets and services various investments in livestock," Complaint ¶ 9, at 2.

     5.    N. Perez and his son, S. Perez, are New Mexico residents.  <u>See</u> Complaint ¶ 4-5, 12, at 2.

     6.    Mike Rogers is an inventory manager for Zia Agricultural.  <u>See</u> Complaint ¶ 16(a), at 3.

     7.    Kottke Cattle and Zia Agricultural "engaged in a series of transactions over time, all of which involved Kottke purchasing cattle and Zia caring for the cattle until the investment could be realized."  Complaint ¶ 13, at 2.

     8.    At first, "the investments returned expected values and Zia appeared to properly account to Kottke's inventory."  Complaint ¶ 14, at 2.

     9.    "During the course of later transactions, however, Zia has repeatedly and consistently failed to account for the production of the investments, allowed/caused unnecessary losses, overcharged Kottke for Zia's services and pass-through expenses, and refused/failed to pay Kottke for investment income realized."  Complaint ¶ 15, at 2-3.

2.    **The "Mexford" Program.**

10.    In 2019, Kottke Cattle "paid Zia approximately $1.5M for an investment in 2,004 head of cattle ('HD')."  Complaint ¶ 16(a), at 3.

11.    Kottke Cattle paid Zia Agricultural "more than $400k in various charges for services related to the 2,004 HD."  Complaint ¶ 16(a), at 3.

12.    Under the parties' agreement, Zia Agricultural was to receive twenty percent of the profits from the sale of the Mexford cattle, and Kottke Cattle would receive the remainder.  See Complaint ¶ 16(a), at 3.

13.    Zia Agricultural agreed to purchase cattle from Kottke Cattle "according to an agreed pricing scheme" once the livestock were "ready to go to a feed yard."  Complaint ¶ 16(a), at 3.

14.    So far, "Zia has only accounted for the sale of 420 HD," leaving 1,584 HD for which there is no accounting.  Complaint ¶ 16(a), at 3.

15.    In early 2021, Glen Kottke contacted Mike Rogers "to ask about the whereabouts of the Mexford cattle, which he expected to still be on pasture," but learned that the cattle had been sold approximately a year earlier.  Complaint ¶ 16(a), at 4.

3.    **The "GY1" Program.**

16.    In 2019, Kottke Cattle paid Zia Agricultural "approximately $1.2M for an investment in 1,541 HD."  Complaint ¶ 16(b), at 4.

17.    Kotte Cattle paid Zia Agricultural $1.2 million "under the condition that Zia would pay Kottke its proceeds from the Mexford Program by year's end."  Complaint ¶ 16(b), at 4.

18.    Zia Agricultural did not pay Kottke Cattle proceeds from the Mexford Program before the end of that year.  See Complaint ¶ 16(b), at 4.

19.     The GY1 Agreement was "otherwise structured substantially similar" to the Mexford Agreement.  See Complaint ¶ 16(b), at 4.

20.     Zia Agricultural has not accounted for the cattle that Kottke Cattle purchased under the GY1 Agreement.  See Complaint ¶ 16(b), at 4.

**4.     The "Source 2" Program.**

21.     In 2020, Kottle Cattle paid Zia Agricultural "more than $1.8M for an investment in more than 2,000 HD for Source 2."  Complaint ¶ 16(c), at 4-5.

22.     Kottke Cattle entered into the agreement believing that Zia Agricultural would purchase cattle for the Source 2 program "exclusively from the Milk Source Dairy, which were supposed to be of a specific breed and quality," then feed them at "a feed lot called Heifer Source located in Liberal, Kansas . . . for an agreed price to feed the cattle to sale weight."  See Complaint ¶ 16(c), at 4.

23.     Kottke Cattle believed that it was "investing entirely in NHTC certified . . . Holstein/Angus calves from the Milk Source Dairy in Wisconsin."[1]  See Complaint ¶ 16(c), at 5.

24.     Under the Source 2 program, "[a]ll of the animals were to be created by artificial insemination using semen paid for by Kottke and shipped to Milk Source Dairy."  Complaint ¶ 16(c), at 5.

25.     While, "initially, Zia purchased some Source 2 cattle from Milk Source Dairy and sent them to Heifer Source, as planned," Zia Agricultural "eventually ceased purchasing the cattle

---

[1] The Non-Hormone Treated Cattle ("NHTC") Program is a United States Department of Agriculture certification program which "has been in effect since 1999, when the European Union (EU) and the U.S. agreed to control measures to facilitate the trade of non-hormone treated beef, including veal."  USDA, Non-Hormone Treated Cattle Program, available at: https://www.ams.usda.gov/services/imports-exports/nhtc.

from Milk Source and instead started purchasing inferior cattle from other locations, and sending them to a different feed lot, Beef City, while nonetheless attributing them to Kottke's Source 2 inventory."  Complaint ¶ 16(c), at 5.

26.     247 HD came from Milk Source Dairy.  See Complaint ¶ 16(c), at 5.

27.     Zia Agricultural purchased 1,853 HD from Mellencamp Dairy, in Idaho, and those cattle were "inferior Jersey/Angus calves."  Complaint ¶ 16(c), at 5.

28.     216 HD were from Ponderosa Dairy in Idaho.  See Complaint ¶ 16(c), at 5.

29.     "None of the Idaho animals appear to have resulted from the semen shipped to Milk Source."  Complaint ¶ 16(c), at 5.

30.     Zia Agricultural borrowed against the value of the cattle to finance their feed, so that, "when the cattle were sold, the proceeds first went to repaying the amount financed, which was nearly the entirety of the cattle's value, with any remaining profit also going to Zia." Complaint ¶ 16(c), at 6.

31.     Other than "one credit of $98k during the course of the investment," Zia Agricultural has not paid Kottke Cattle anything for the sale of these cattle.  Complaint ¶ 16(c), at 6.

**5.     The "Clovis 1" Program.**

32.     Under the parties' "Clovis 1" agreement, Zia Agricultural "was to send semen to the Clovis Dairy in New Mexico," where the cows were to be artificially inseminated, and "their offspring would then belong to Kottke and raised as beef animals."  Complaint ¶ 16(d), at 6.

33.     In February, 2019, Kottke Cattle paid Zia Agricultural $109,375.00 for "semen costs and freight for 6 months of semen shipments (June -- December)."  Complaint ¶ 16(d), at 6.

34.     Kottke Cattle received no livestock from this program, and learned in late 2019 and

early 2020 that its "calf inventory at Clovis Dairy was zero."  Complaint ¶ 16(d), at 7.

      **6.**     **The "Calf Programs."**

35.     Zia Agricultural purchased calves for Kottke Cattle in 2014.  <u>See</u> Complaint ¶ 16(e), at 7.

36.     Rogers would track the calves as they progress from pasture to a feed yard, and Zia Agricultural coordinated an arrangement "where Kottke contracted directly with the feed yard to feed out the calves and then sell them to packers."  Complaint ¶ 16(e), at 7.

37.     Rogers was told that the 2019 calf crop sent to Beef City was "Narciso Perez's personal property," Complaint ¶ 16(e), at 7, because N. Perez had purchased the livestock from Kottke Cattle, <u>see</u> Complaint ¶ 16(e), at 8.

38.     There were no documents showing the cattle sale from Kottke Cattle to N. Perez, and "Zia's inventory still reflected the cattle as belonging to Kottke."  Complaint ¶ 16(e), at 8.

39.     Beef City treated the calves as belonging to N. Perez, because they had "Zia's brand and because Kottke had not filed a lien."  Complaint ¶ 16(e), at 8.

40.     N. Perez received the financed amount, as well as the profits from the sale, once the calves were sold.  <u>See</u> Complaint ¶ 16(e), at 8.

41.     Kottke Cattle learned of this transaction in the Spring of 2021.  <u>See</u> Complaint ¶ 16(e), at 8.

42.     N. Perez has not paid Kottke Cattle for the 2019 crop of calves. <u>See</u> Complaint ¶ 16(e), at 9.

43.     Rogers resigned his position with Zia Agricultural on August 31, 2021.  <u>See</u> Complaint ¶ 16(e), at 9.

44.     "One crop of calves remains in progress."  Complaint ¶ 16(e), at 9.

7.    **Kottke Cattle's Remaining Livestock in Zia Agricultural's Possession**.

45.    The remaining cattle and calves from the Calf Programs are "kept on various pasture locations throughout Northeastern New Mexico."  Complaint ¶ 17, at 10.

46.    Kottke Cattle agreed to pay Zia Agricultural for the "necessary expenses related to the feeding and care and breeding of its cattle" in exchange for Zia Agricultural making those arrangements.  Complaint ¶ 19, at 10.

47.    Between November, 2020, and August, 2021, Zia Agricultural invoiced Kottke Cattle for $651,390.18 for the care and maintenance of those livestock.  See Complaint ¶ 20, at 10.

48.    New statements that Zia Agricultural provided for those same months increased the amounts claimed by "adjust[ing] the December amounts for the sale of culled cows" and "reduc[ing] the original due."  Complaint ¶ 22, at 10.  See Complaint ¶ 21, at 10.

49.    The new statements also include charges "from old dates at feed lots (dates as old as 2018) and claimed those are now owed as well,"  Complaint ¶ 22, at 10, which Kottke Cattle had not seen previously, see Complaint ¶ 23, at 10.

50.    The difference between the initial charges and those on the new statement total $480, 359.09.  See Complaint ¶ 25, at 11.

51.    Kottke Cattle contacted Zia Agricultural to arrange relocation of its remaining livestock, but Zia Agricultural "initially failed/refused to respond to Kottke."  Complaint ¶ 28, at 11.

52.    "[O]n or about August 23, 2021, Zia, through counsel, asserted that Kottke owed Zia $838,528.72 for the care and feeding of the animals" remaining from the Calf Programs.  Complaint ¶ 29, at 11.

53.    In the same letter, Zia Agricultural informed Kottke Cattle that Zia Agricultural has

an agister's lien[2] on the animals.  See Complaint ¶ 30, at 11.

54.    "On or about August 27, 2021," Kottke Cattle responded to Zia Agricultural, demanding an accounting of Zia Agricultural's investment activities, disputing that it owed Zia Agricultural  any amount, and asserting that the lien has no basis.  Complaint ¶ 31, at 11.

55.    "On or about September 15, 2021, Zia sent Kottke a period invoice for the care and maintenance of the same animals, showing that the amount due was $603,486.02."  Complaint ¶ 32, at 11.

56.    On or about September 28, 2021, Zia Agricultural sent Kottke Cattle a Notice of Sale, stating that the cattle would be "sold by auction on October 28, 2021."  Complaint ¶ 33, at 11-12.  See Notice of Sale at 1-2, filed October 15, 2021 (Doc. 1-1).

57.    The Notice of Sale asserts that Kottke Cattle owes Zia Agricultural $838,528.72, as well as accrued costs since July 31, 2021, of $66,378.40, and unknown attorney's fees, costs, and expenses.  See Complaint ¶ 34, at 12; Notice of Sale at 1.

58.    On or about September 30, 2021, Kottke Cattle again wrote to Zia Agricultural, reiterating the position that it took in its August 27, 2021, letter, and also noting the discrepancy

---

[2]An agister's lien is "a lien upon an animal provided by contract or statute as a security for fees of a person who has fed or cared for the animal."  USLegal.com, Agister's Lien Law and Legal Definition, available at https://definitions.uslegal.com/a/agisters-lien/.   New Mexico's statute provides:

> Innkeepers, livery stable keepers, lessors and agistors and those who board others for pay or furnish feed, shelter or pasture for the property and stock of others shall have a lien on the property and stock of such guest or guests and lessees or of those to whom feed or shelter has been furnished until the same is paid, and shall have the right to take and retain possession of such property and stock until the indebtedness is paid.

N.M.S.A. § 48-3-7(A).

between the amount Zia Agricultural claimed in its September invoice -- $603,486.02 -- and the amount claimed in the Notice of Sale -- $838,528.72.  See Complaint ¶¶ 31-32, at 11; id. ¶¶ 34-35, at 12.

59.    Zia Agricultural responded on or about October 5, 2021, "reasserting that it was entitled to a lien and would proceed with the sale, as noticed."  Complaint ¶ 37, at 12.

60.    In its October 5, 2021, letter, Zia Agricultural asserted that the $235,042.70 discrepancy between the September 15, 2021, invoice and the Notice of Sale was "explained by Zia offsetting the claimed amount by 'other funds held by Zia for Kottke.'"  Complaint ¶ 37, at 12 (no citation for quotation).

61.    Kottke Cattle has not authorized Zia Agricultural to "'hold' any of their funds." Complaint ¶ 38, at 12 (no citation for quotation).

62.    The Notice of Sale states that the livestock will be "sold to the highest bidder for cash or certified funds on October 28, 2021 at 10:00 a.m. through livestock auction held at Cattleman's Livestock Commission Company, Highway 54 West, Dalhart, TX, 79022."  Notice of Sale at 1.

63.    On October 15, 2021, Zia Agricultural sent Kottke Cattle an Amended Notice of Sale.  See Complaint ¶ 33, at 12; Amended Notice of Sale at 1-3, filed October 15, 2021 (Doc. 1-2).

64.    The Amended Notice of Sale adds the following provision to the Notice of Sale:

> In the event that all livestock are not able to be sold on October 28, 2021, for any reasons, the remaining livestock will be advertised for sale every following Thursday, at alternating locations starting with La Junta Livestock Commission Inc., 24026 County Rd 20.25, La Junta, Colorado 81050, on November 4, 2021, and then at Cattleman's Livestock Commission Company, Highway 54 West, Dalhart, TX, 79022, thereafter alternating between the two locations, until all livestock are sold.

Amended Notice of Sale at 1.

**LAW REGARDING REQUESTS FOR A TEMPORARY RESTRAINING ORDER**

The requirements for a TRO issuance are essentially the same as those for a PI order.  See People's Trust Fed. Credit Union v. Nat'l Credit Union Admin. Bd., 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018)(Browning, J.); 13 Moore's Federal Practice ¶ 65.36(1), at 65-83 (3d ed. 2004). The primary differences between a TRO and a PI are that a TRO may issue without notice to the opposing party and that TROs are limited in duration to fourteen days.  See Fed. R. Civ. P. 65(b)(1)-(2).  In both cases, however, injunctive relief is an "extraordinary remedy," and the movant must demonstrate a "clear and unequivocal right" to have a request granted.  Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1256 (10th Cir. 2003)).  See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1181.  The Supreme Court of the United States of America has explained that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981).  See Keirnan v. Utah Transit Auth., 339 F.3d 1217, 1220 (10th Cir. 2003)("'In issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits.'")(quoting Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d 351, 355 (10th Cir. 1986)).

To establish its right to a TRO under rule 65(b), a moving party must demonstrate that "immediate and irreparable injury, loss, or damage will result" unless a court issues the order.  Fed. R. Civ. P. 65(b).  "[I]rreparable injury" is "harm that cannot be undone, such as by an award of compensatory damages or otherwise."  Salt Lake Tribune Pub. Co., LLC v. AT & T Corp., 320 F.3d 1081, 1105 (10th Cir. 2003)(citing Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d at 355).  A moving party must "establish that he is likely to succeed

on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)("Winter")(citing Munaf v. Geren, 553 U.S. 674, 689-90 (2008)); Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542 (1987); Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-12 (1982)).

The likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis. Nken v. Holder, 556 U.S. 418, 434 (2009). It is insufficient, moreover, that a moving party demonstrate that there is only a "possibility" of either success on the merits or irreparable harm. Diné Citizens Against Ruining Our Env't v. Jewell, 839 F.3d 1276 (10th Cir. 2016)("Diné"). In Diné, the Tenth Circuit held that a relaxed test for preliminary relief is "inconsistent with the Supreme Court's recent decision in Winter v. Natural Resources Defense Council," which "overruled the Ninth Circuit's application of a modified preliminary injunction test under which plaintiffs . . . could receive a preliminary injunction based only on a possibility, rather than a likelihood, of irreparable harm." Diné, 839 F.3d at 1282 (citing Winter, 555 U.S. at 22). The Tenth Circuit concluded that, although the standard that the Supreme Court found wrong in Winter v. Natural Resources Defense Council, Inc. dealt with the irreparable-harm factor, "Winter's rationale seems to apply with equal force" to the likelihood-of-success factor. Diné, 839 F.3d at 1282. Accordingly, the Tenth Circuit held that "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." Diné, 839 F.3d at 1282.

Under rule 65(c), the Court may issue a TRO "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The United States, and its

officers and agencies, are exempt from this requirement.  See Fed. R. Civ. P. 65(c).  The Court must consider whether a bond is necessary.  See Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F.2d 1461, 1462 (10th Cir. 1987)(concluding that, where a trial court does not "contemplate the imposition of the bond, its order granting a preliminary injunction is unsupportable.").  See also Flood v. ClearOne Comm'ns, 618 F.3 1100, 1126 n.4 (10th Cir. 2010).  Courts in the Tenth Circuit "have 'wide discretion under Rule 65(c) in determining whether to require security''' and may, therefore, impose no bond requirement.  RoDa Drilling Co. v. Siegal, 552 F.3d at 1215 (quoting Winnebago Tribe of Neb. v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003)).

The Court has written several times on the topic of TROs and PIs.  In O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d 1239 (D.N.M. 2017), the Court issued a PI requiring the United States Citizen and Immigration Services ("USCIS") to reconsider the I-129 nonimmigrant R-1 petition to a religious minister to the O Centro Espirita Beneficiente Uniao Do De Vegetal Christian spiritualist religious organization ("O Centro").  See O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d at 1269.  The Court issued that relief, in part because it was substantially likely that the USCIS' first denial of the minister's R-1 petition violated the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1 ("RFRA").  See O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d at 1263-64.  USCIS had denied the petition, because the minister made no money and because the minister was not part of an established missionary program.  See O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d at 1264.  O Centro theology precluded its ministers from making money, and an established missionary program requires that at least one religious worker, at some point, be compensated.  See O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d at 1264.  The Court reasoned, accordingly, that DHS had burdened substantially the minister's right

to exercise his religion, because, in effect, the R-1 petition review required the minister to make money to preach his liturgy in the United States, even though his religion forbade him from making money.  See O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d at 1264. The minister also met a PI's other three prongs, so the Court granted the relief requested.  See 286 F. Supp. 3d at 1265-66.  The Court has also issued a TRO, prohibiting the Santa Fe Public Schools from suspicionless pat-down searches of its students before prom and graduation.  See Herrera v. Santa Fe Pub. Schs., 792 F. Supp. 2d at 1200.  It concluded that: (i) a violation of the Fourth Amendment of the Constitution of the United States "standing alone" constitutes irreparable injury; (ii) suspicionless pat-down searches involving "touching of students' bodies," including "cupping and shaking girls' breasts," are unreasonably and unconstitutionally intrusive, even if those searches likely are effective in apprehending students with drugs, weapons, alcohol, or "distracting contraband"; (iii) the threatened injury outweighs the TRO's damage; and (iv) the TRO is not adverse to the public, because it would protect other students' constitutional rights who attend prom and graduation.  Herrera v. Santa Fe Pub. Schs., 792 F. Supp. 2d at 1194-98.  The Court denied a request for injunctive relief in Salazar v. San Juan County Detention Center, No. CIV 15-0417 JB/LF, 2016 WL 335447 (D.N.M. Jan. 15, 2016)(Browning, J.), after concluding that, although the plaintiffs faced irreparable harm, the balance of equities favored them, and an injunction was not adverse to the public interest, the plaintiffs were unlikely to succeed on the merits.  See Salazar v. San Juan Cty. Detention Ctr., 2016 WL 335447, at *43-52.

## LAW REGARDING EX PARTE TROS

Rule 65(b)(1) of the Federal Rules of Civil Procedure provides:

> The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:

> (A)    Specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
>
> (B)    The movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

65(b)(1) Fed. R. Civ. P.  Because ex parte TROs may be vulnerable to abuse, the procedural requirements of rule 65(b)(1) must be scrupulously observed.  See Leslie v. Penn Cent. R. Co., 410 F.2d 750, 751 (6th Cir. 1969)("[A] district court should scrupulously observe the requirements of Rule 65 in the delicate business of granting temporary restraining orders."); 11A C. Wright & A. Miller, Fed. Prac. & Proc. Civ. § 2952 (3d ed. April 2021)(citing Developments in the Law -- Injunctions, 78 Harv. L. Rev. 994, 1060 (1965)("Moreover, because the ex parte procedure provides no guaranty of the truth of the facts upon which the order is based, it is subject to abuse.")).  The advisory committee notes to the 1966 amendment to rule 65(b) observe that, "in view of the possibly drastic consequences of a temporary restraining order, the opposition should be heard, if feasible, before the order is granted," and that "informal notice, which may be communicated to the attorney rather than the adverse party, is to be preferred to no notice at all." Fed. R. Civ. P. 65(b) advisory committee note to 1966 amendment.

In addition, "[t]he issuance of an ex parte temporary restraining order is an emergency procedure," 11A C. Wright & A. Miller, Fed. Prac. & Proc. Civ. § 2951 (3d ed. April 2021)(citing Little Tor Auto Ctr v. Exxon Co., USA, 822 F. Supp. 141, 143 (S.D.N.Y. 1993)(Broderick, J.), which "is appropriate only when the applicant is in need of immediate relief," 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2951 (citing First Tech. Safety Sys., Inc. v. Depinet, 11 F.3d 641, 650 (6th Cir. 1993)("In order to justify proceeding ex parte because notice would render further

action fruitless, the applicant must do more than assert that the adverse party would dispose of evidence if given notice.")).

> The ex parte temporary restraining order is indispensable to the commencement of an action when it is the sole method of preserving a state of affairs in which the court can provide effective final relief.  Immediate action is vital when imminent destruction of the disputed property, its removal beyond the confines of the state, or its sale to an innocent third party is threatened.  In these situations, giving the defendant notice of the application for an injunction could result in an inability to provide any relief at all.

11A Fed. Prac. & Proc. Civ. § 2951 (citing Developments in the Law -- Injunctions, 78 Harv. L. Rev. at 1060).

## LAW REGARDING PRELIMINARY INJUNCTIONS

Like other forms of injunctive relief, TROs and PIs are subject to "well-established principles of equity" requiring a plaintiff to demonstrate that "remedies available at law, such as monetary damages, are inadequate to compensate for that injury," and "a remedy in equity is warranted" in light of "the balance of hardships between the plaintiff and defendant."  eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).  See N. N.M. Stockman's Ass'n v. United States Fish & Wildlife Serv., 494 F. Supp. 3d 850, 1030 (D.N.M. 2020)(Browning, J.).  "Because 'a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal.'"  Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir. 2001)(quoting SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1098 (10th Cir. 1991)).  To show that the extreme PI remedy should issue, "[a] party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at law."  N. Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306 (1984).  Before a district court may issue a PI pursuant to rule 65 of the Federal Rules of Civil Procedure, the movant must make four showings: (i) that the movant is likely to "suffer irreparable injury unless the injunction issues"; (ii) that "the threatened injury" to

the movant if the court does not issue the PI "outweighs whatever damage the proposed injunction may cause the opposing party"; (iii) that "the injunction, if issued, would not be adverse to the public interest"; and (iv) that "there is a substantial likelihood [of success] on the merits." Resolution Trust Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992). See Winter, 555 U.S. at 19 ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." (citing Munaf v. Geren, 553 U.S. 674, 688-89 (2008))). The movant bears the burden of demonstrating all four prongs' satisfaction. See Automated Mktg. Sys., Inc. v. Martin, 467 F.2d 1181, 1183 (10th Cir. 1972). "[A]ny modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." Diné, 839 F.3d at 1282. "A plaintiff suffers irreparable harm 'when the court would be unable to grant an effective remedy after a full trial because such damages would be inadequate and difficult to ascertain.'" Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., 778 F. Supp. 2d 1180, 1190 (D.N.M. 2011)(Browning, J.)(quoting Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d 1149, 1156 (10th Cir. 2001)(citing Kikumura v. Hurley, 242 F.3d at 963)). "Tenth Circuit decisions have linked the 'irreparable injury' inquiry to the 'likelihood of success' inquiry, holding that a plaintiff who cannot demonstrate a substantial likelihood of success is not entitled to a presumption of irreparable harm." Logan v. Pub. Emps. Ret. Ass'n, 163 F. Supp. 3d 1007, 1030 (D.N.M. 2016)(Browning, J.)(citing Schrier v. Univ. of Colo., 427 F.3d 1253, 1266 (10th Cir. 2005)).

"[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held[.]'" Schrier v. Univ. of Colo., 427

F.3d at 1258 (quoting Univ. of Tex. v. Camenisch, 451 U.S. at 395).  In that vein, the Tenth Circuit

has identified the following three specifically disfavored preliminary injunctions: (i) "preliminary

injunctions that alter the status quo"; (ii) "mandatory preliminary injunctions," meaning

injunctions that compel, rather than prohibit, activity on the enjoined party's part; and

(iii) "preliminary injunctions that afford the movant all the relief that it could recover at the

conclusion of a full trial on the merits."  Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting

O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 975 (10th Cir. 2004),

aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546

U.S. 418 (2006)("O Centro II")).  Accord Westar Energy, Inc. v. Lake, 552 F.3d 1215, 1224 (10th

Cir. 2009).  Regarding mandatory PIs, the Court has explained:

> The Tenth Circuit "characterize[s] an injunction as mandatory if the
> requested relief 'affirmatively require[s] the nonmovant to act in a particular way,
> and as a result . . . place[s] the issuing court in a position where it may have to
> provide ongoing supervision to assure the nonmovant is abiding by the injunction.'"
> Schrier v. Univ. of Colorado, 427 F.3d at 1261 (all alterations but first in Schrier v.
> Univ. of Colo.)(quoting O Centro [II] . . . , 389 F.3d at 979).  The Tenth Circuit has
> thus disclaimed -- or at least augmented -- the simpler and more intuitive way of
> defining these terms, i.e., that a prohibitory injunction is one in which the court
> orders the enjoined party not to do something, and a mandatory injunction is one in
> which the court orders the enjoined party to do something.

Salazar v. San Juan Cty. Det. Ctr., 2016 WL 335447, at *40.  When evaluating whether the

issuance of a requested injunction would alter the status quo between the parties, the court should

look at "the reality of the existing status and relationships between the parties, regardless of

whether the existing status and relationships may ultimately be found to be in accord or not in

accord with the parties' legal rights.  SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1100

(10th Cir. 1991), overruled on other grounds by O Centro II, 389 F.3d at 975).  "The meaning of

this category is self-evident."  Salazar v. San Juan Cty. Det. Ctr., 2016 WL 335447, at *41.  With

respect to PIs that will change the status quo, "the movant has an 'even heavier burden of showing that the four factors listed above weigh heavily and compellingly in movant's favor before such an injunction can be issued.'" Salt Lake Tribune Publ'g Co. v. AT & T Corp., 320 F.3d 1081, 1099 (10th Cir. 2003)(quoting Kikumura v. Hurley, 242 F.3d at 955 (quoting SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d at 1098-99)).

"[I]n an action for money damages, the district court does not have the power to issue a preliminary injunction[.]" United States ex rel. Rahman v. Oncology Assocs., 198 F.3d 489, 495-96 (4th Cir. 1999)(citing Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 324-25 (1999)).  See Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418-20 (8th Cir. 1987)(concluding that a PI should not issue where a remedy of money damages is available). Federal courts have the inherent equitable power to issue a preliminary injunction only when it is necessary to protect a movant's entitlement to a final equitable remedy.  See, e.g., De Beers Consol. Mines v. United States, 325 U.S. 212, 219-23 (1945); Reebok Int'l, Ltd. v. Marnatech Enters., Inc., 970 F.2d 552, 559-60 (9th Cir. 1992).

### LAW REGARDING DIVERSITY JURISDICTION AND ERIE

Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007).  Accord Mem. Hosp. v. Healthcare Realty Tr. Inc., 509 F.3d 1225, 1229 (10th Cir. 2007).  The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.).  "Just

as a court engaging in statutory interpretation must always begin with the statute's text, a court

formulating an Erie prediction should look first to the words of the state supreme court." Peña v.

Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[3]  If the Court finds only an

opinion from the Court of Appeals of New Mexico, while "certainly [the Court] may and will

consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by

the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court

decision." Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that

where the only opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal

district court sitting in this district, is to predict what the Supreme Court of New Mexico would do

if the case were presented to it")(citing Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir.

---

[3]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014)(Browning, J.).  Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts.  The factors to which a federal court should look before making an Erie prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times.  See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17.  In short, a state supreme court case that a federal court Erie predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state"))).[4]   The Court may also rely on

---

[4]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

. . . .

We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

. . . .

The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Tenth Circuit decisions interpreting New Mexico law.  See Anderson Living Trust v. WPX Energy

Prod., LLC, 27 F. Supp. 3d at 1243 & n.30.[5]  Ultimately, "the Court's task is to predict what the

---

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The
Supreme Court has softened this position over the years; federal courts are no longer bound by
state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the
highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at
465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A
James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Decisions of
intermediate state appellate courts usually must be followed . . . [and] federal courts should give
some weight to state trial courts decisions." (emphasis and title case omitted)).

[5]In determining the proper weight to accord Tenth Circuit precedent interpreting New
Mexico law, the Court must balance the need for uniformity between federal court and state court
interpretations of state law with the need for uniformity among federal judges.  If the Court adheres
too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing
years, then parties litigating state-law claims will be subject to a different body of substantive law,
depending on whether they litigate in state court or federal court.  This result frustrates the purpose
of Erie, which held that federal courts must apply state court interpretations of state law, rather
than their own, in part so that parties achieve a consistent result regardless of the forum.  This
consideration pulls the Court toward according Tenth Circuit precedent less weight and according
state court decisions issued in the ensuing years more weight.  On the other hand, when the state
law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper
interpretation.  Otherwise, different federal judges within the same circuit -- or even the same
district, as district courts' decisions are not binding, even upon themselves -- would be free to
adopt differing interpretations of a state's law.  This consideration pulls the Court towards a
stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless
whether it accurately reflects state law --at least provides consistency at the federal level, so long
federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state court
decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth
Circuit precedent unless there is intervening case law directly on point from the state's highest
court, on one end; and independently interpreting the state law, regarding the Tenth Circuit
precedent as no more than persuasive authority, on the other.  In striking this balance, the Court
notes that it is generally more concerned about systemic inconsistency between the federal courts
and the state courts than it is about inconsistency among federal judges.  Judges, even those within
a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law
differently from one another; this inconsistency is part and parcel of a common-law judicial
system.  More importantly, litigants seeking to use forum selection to gain a substantive legal
advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district

- 22 -

judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal.  All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would.  Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency.  When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law.  Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts are.  More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do.  As such, Tenth Circuit precedent can lag behind developments in state law -- developments that the district courts may be nimble enough to perceive and adopt.  Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted.  Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look.  Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit.  Every federal judicial district in the nation, except the District of Wyoming, covers at most one state.  It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the federal Constitution possess.  A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases that were available to the Tenth Circuit and that the Tenth Circuit considered, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that *x* is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is *x*.  Its holdings are descriptive, not prescriptive -- interpretive, not normative.  Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and

influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

The purpose of Erie is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." Moore's Federal Practice § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (citation and internal quotation marks omitted))). This formulation may not be the most precise one if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see Abbott Labs. v. Granite State Ins., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(Shadur, J.)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. See Allstate Ins. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions. To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play. The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time. While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve

people, nor must it be unanimous) -- federal cases interpreting state law often become stale.  New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone.  The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree.  In Wankier v. Crown Equipment Corp., the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do.  In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*.  Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.).  From this passage, it seems clear that the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court."  The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that").  A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue," Wankier v. Crown Equip. Corp., 353 F.3d at 866 -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional.  Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts.  Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition.  In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of Allen [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law."  Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

state supreme court would do." Wade v. EMCASCO Ins. Co., 483 F.3d at 666. Accord Mosley
v. Titus, 762 F. Supp. 2d at 1332 (citation omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d
1174, 1188-89 (D.N.M. 2008)(Browning, J.).

## NEW MEXICO LAW REGARDING BREACH-OF-CONTRACT CLAIMS

A contract is a legally enforceable promise that must consist of an offer, an acceptance,
consideration, and mutual assent. See N.M. R. Ann., Civ. UJI 13-801. A person may breach a
contract by failing to perform a contractual obligation when the performance is required, unless
that performance is otherwise excused. See N.M. R. Ann., Civ. UJI 13-822. Incomplete
performance is a breach of contract. See Cochrell v. Hiatt, 1981-NMCA-125, ¶ 6, 638 P.2d 1101,
1103-04 (holding that, where the contract called for the roof to be restored to a "healthy" state and
guaranteed the work for twenty-five years, because the roof leaked within the twenty-five year
period, the defendant's performance was incomplete, and the defendant was in breach of the
contract). Under New Mexico law, "[t]he elements of a breach-of-contract action are the existence
of a contract, breach of the contract, causation, and damages." Abreu v. N.M. Children, Youth

---

Whether the decision to limit the intervening authority a district court can consider was
intentional or not, the Tenth Circuit has picked it up and run with it. In Kokins v. Teleflex, Inc.,
the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion
from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit
interpretation of Colorado law. See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir.
2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided Biosera[, Inc. v. Forma Scientific,
Inc., 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's highest
court.'" (emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866)).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to
independently administer the Erie doctrine. More importantly, the Tenth Circuit's view may be at
tension with the above-quoted Supreme Court precedent, as well as its own prior case law.
Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior
federal appellate decision [interpreting state law] is persuasive." Moore's § 124.22[4] (citing State
Farm Mut. Auto. Ins. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)). Still, the Court
is bound to abide by the Tenth Circuit's interpretation of Erie.

and Families Dep't, 797 F. Supp. 2d 1199, 1247 (D.N.M. 2011)(Browning, J.).

> [A] complaint on breach of contract must allege: (1) the existence of a valid and binding contract; (2) the plaintiff's compliance with the contract and his performance of the obligations under it; (3) a general averment of the performance of any condition precedent; and (4) damages suffered as a result of defendant's breach.

McCasland v. Prather, 1978-NMCA-098, ¶ 7, 585 P.2d 336, 338.

Applying these principles in Armijo v. New Mexico Department of Transportation, No. CIV. 08-0336 JB/ACT, 2009 WL 1329192 (D.N.M. Apr. 6, 2009)(Browning, J.), the Court concluded that a plaintiff's allegations failed to state a claim for breach of contract. In support of the breach-of-contract claim, the plaintiff asserted that "the Department would follow state employment policies and procedure, and that the Department terminated him in breach of those policies without just cause." 2009 WL 1329192, at *7. The Court noted that the plaintiff did not "indicate what contractual provisions or employment policies the Department breached" and did not say "to what his employment contract entitles him or of what the Department deprived him." 2009 WL 1329192, at *7. The Court found that there was "not enough . . . to determine whether, if taken as true, the Complaint's allegations would support claims for breach of contract." 2009 WL 1329192, at *8.

On the other hand, the Court has previously determined that a pro se plaintiff sufficiently alleged that his counsel breached a contract for legal representation by alleging that his former counsel promised to represent the plaintiff at forfeiture proceedings, that the plaintiff paid the counsel, and that the counsel failed to represent the plaintiff. See Archuleta v. City of Roswell, No. CIV 10-1224 JB/RHS, 2012 WL 4950324, at *16-17 (D.N.M. Sept. 30, 2012)(Browning, J.). "Additionally, in spite of the general bar on punitive damages for breach-of-contract cases, the Supreme Court of New Mexico has recognized that punitive damages may be recoverable under

some circumstances for a breach of contract." Anderson Living Trust v. ConocoPhillips Co., LLC,

No. CIV 12-0040 JB/LFG, 2013 WL 3456913, at *42 (June 28, 2013)(Browning, J.).   The

Supreme Court of New Mexico stated in Romero v. Mervyn's, 1989-NMSC-081, 784 P.2d 991:

"Our previous cases clearly establish that, in contract cases not involving insurance, punitive

damages may be recovered for breach of contract when the defendant's conduct was malicious,

fraudulent, oppressive, or committed recklessly with a wanton disregard for the plaintiff's rights."

1989-NMSC-081, ¶ 23, 784 P.2d at 998.   Punitive damages are not available when they are

"predicated solely on gross negligence.  In addition to, or in lieu of, such negligence there must be

evidence of an evil motive or a culpable mental state." Paiz v. State Farm Fire & Cas. Co., 1994-

NMSC-079, ¶ 25, 880 P.2d 300, 308 (internal quotation marks omitted).  The Supreme Court of

New Mexico has defined "reckless disregard" sufficient for an award of punitive damages as

"when the defendant knows of potential harm to the interests of the plaintiff but nonetheless utterly

fails to exercise care to avoid the harm." Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079,

¶ 26, 880 P.2d at 308 (citation and secondary quotations omitted).  A defendant does not act with

reckless disregard to a plaintiff's rights merely by failing "to exercise even slight care," absent the

requisite "culpable or evil state of mind." Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079,

¶ 26, 880 P.2d at 308 (citation and secondary quotations omitted).  The New Mexico Civil Jury

Instructions define the elements necessary for an award of punitive damages for a breach of

contract as follows:

> If you find that _____ (name of party making claim for punitive damages)
> should recover compensation for damages, and if you further find that the conduct
> of _____ (name of party whose conduct gives rise to a claim for punitive
> damages) was [malicious], [reckless], [wanton], [oppressive], or [fraudulent], then
> you may award punitive damages.

N.M. R. Ann., Civ. UJI 13-861.

## NEW MEXICO LAW REGARDING FRAUD

Under New Mexico law, the elements of fraudulent misrepresentation are: "(i) a misrepresentation of fact, (ii) either knowledge of the falsity of the representation or recklessness on the part of the party making the misrepresentation, (iii) intent to deceive and to induce reliance on the misrepresentation, and (iv) detrimental reliance on the misrepresentation." Pedroza v. Lomas Auto Mall, Inc., 600 F. Supp. 2d 1162, 1167 (D.N.M. 2009)(Browning, J.)(quoting Cain v. Champion Window Co., 2007-NMCA-085, ¶ 22, 142 N.M. 209, 216, 164 P.3d 90, 97). See Encinias v. Whitener Law Firm, P.A., 2013-NMSC-045, ¶ 22, 310 P.3d 611, 620. Fraudulent "[i]ntent may be inferred from the circumstances surrounding the dealings . . . ." Maxey v. Quintana, 1972-NMCA-069, ¶ 19, 84 N.M. 38, 42, 499 P.2d 356, 360. Accord Pedroza v. Lomas Auto Mall, Inc., 600 F. Supp. 2d at 1167. The party asserting fraudulent misrepresentation must prove each of those elements by clear-and-convincing evidence. See Applied Cap., Inc. v. Gibson, No. CIV 05-98 JB/ACT, 2007 WL 5685131, *13 (D.N.M. Sept. 27, 2007)(Browning, J.)(citing Cyprus Amax Minerals Co. v. Duran Sand & Gravel, Inc., No. CIV 03–1473 JB/ACT, 2006 WL 4079084, at *10 (D.N.M. May 31, 2006)(Browning J.)). See also Simon v. Taylor, 252 F. Supp. 3d 1196, 1231 (D.N.M. 2017)(Browning, J.)(aff'd, 794 Fed. App'x 703 (10th Cir. 2019)). "To recover in fraud, Plaintiffs must establish that they suffered damages that were proximately caused by justifiable reliance on [the defendant's] misrepresentation." Cain v. Champion Window Co. of Albuquerque, LLC, 2007-NMCA-085 ¶ 22, 142 N.M. 209, 216, 164 P.3d 90, 97. "Proximately caused damages are damages that are 'the direct and natural consequences of the reliance on a fraudulent representation.'" Cain v. Champion Window Co. of Albuquerque, LLC, 2007-NMCA-085, ¶ 25, (quoting Williams v. Stewart, 2005-NMCA-061, ¶ 34, 137 N.M. 420, 429, 112 P.3d 281, 290).

## NEW MEXICO LAW REGARDING CONVERSION

According to the Supreme Court of New Mexico, "'[c]onversion is the unlawful exercise of dominion and control over property belonging to another in defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made.'" In re Yalkut, 2008-NMSC-009, ¶ 25, 143 N.M. 387, 394, 176 P.3d 1119, 1126.  See also Muncey v. Eyeglass World, LLC, 2012-NMCA-120, ¶ 22, 289 P.3d 1255, 1262; Ortiz v. N.M. Dep't of Cultural Affairs, No. CIV 16-1396 JB/JHR, 2018 U.S. Dist. LEXIS 2536, at *12 (D.N.M. Jan. 5, 2018)(Browning, J.)(citing Muncey v. Eyeglass World, LLC, 2012-NMCA-120, ¶ 22, 289 P.3d at 1262 (citing In re Yalkut, 2008-NMSC-009, ¶ 25, 143 N.M. at 394, 176 P.3d at 1126)).  "'The measure of damages, in conversion, is the value of the property at the time of conversion with interest.'" Woods v. Collins, 1975-NMCA-018, ¶13, 87 N.M. 370, 371, 533 P.2d 759, 760 (quoting Crosby v. Basin Motor Co., 1971-NMCA-127, ¶ 13, 83 N.M. 77, 79, 488 P.2d 127, 129).

## NEW MEXICO LAW REGARDING UNJUST ENRICHMENT

"To prevail in unjust enrichment, 'one must show that: (1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust.'" City of Rio Rancho v. Amrep Sw. Inc., 2011-NMSC-037, ¶ 54, 150 N.M. 428, 442-43, 260 P.3d 414, 428-29 (quoting Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 129 N.M. 200, 203, 3 P.3d 695, 698).  Equitable claims are typically unavailable if there is an adequate remedy at law.  See Gen. Tel. Co. of the Sw. v. State Tax Comm'n, 1962-NMSC-005, ¶ 19, 69 N.M. 403, 408, 367 P.2d 711, 715; Sims v. Sims, 1996-NMSC-078, ¶ 32, 122 N.M. 618, 624, 930 P.2d 153, 159 ("[E]quity will not act if there is a complete and adequate remedy at law.")(quoting S.P.C.S., Inc. v. Lockheed Shipbuilding & Constr. Co., 631 P.2d 999, 1001 (Wash.

App. 1981)).  Additionally, the "'hornbook rule [is] that quasi-contractual remedies . . . are not to be created when an enforceable express contract regulates the relations of the parties with respect to the disputed issue.'"  Elliott Indus. Ltd. P'ship v. BP America Production Co., 407 F.3d 1091, 1117 (10th Cir. 2005)("Elliott Indus.")(quoting Member Servs. Life Ins. v. Am. Nat'l Bank & Tr. Co. of Sapulpa, 130 F.3d 950, 957 (10th Cir. 1997)).[6]  In Elliott Indus., for example, the Tenth Circuit held that the plaintiffs' leases with ConocoPhillips that defined ConocoPhillips' royalty obligations precluded the plaintiffs' claims that ConocoPhillips' royalty payment practices unjustly enriched it at the plaintiffs' expense.  See 407 F.3d at 1117.  The plaintiffs contended that the leases did not preclude their unjust-enrichment claim, because they did not contain an express contractual provision covering ConocoPhillips' deduction of a thirty-nine percent processing fee from the plaintiffs' royalty payments.  See 407 F.3d at 1117.  The Tenth Circuit reasoned, however, that, although "the contracts may not delineate any specific deductions," the leases "control how royalties are to be paid."  407 F.3d at 1117.  The Tenth Circuit concluded, therefore, that the district court properly granted ConocoPhillips summary judgment on the plaintiffs' unjust-enrichment claim, because "the claim for underpayment of royalties is grounded in the parties' contractual relationships."  407 F.3d at 1117.  See Anderson Living Tr. v. ConocoPhillips Co., LLC, 952 F. Supp. at 1033.

---

[6]As the Tenth Circuit has explained, "when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue."  Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003).  The Court has critiqued the Elliott Indus. decision in the past, though on a different legal issue, and concluded that the Supreme Court of New Mexico would follow a different path.  See Anderson Living Tr. v. WPX Energy Prod., LLC, 312 F.R.D. 620, 625-630 (D.N.M. 2015)(Browning, J.)  The Court reiterates that interpretation here, though not on the issue quoted above.

## ANALYSIS

The Court denies Kottke Cattle's request for a TRO, because it determines that Kottke Cattle has not shown that damages would be an inadequate remedy or that Kottke Cattle would suffer irreparable injury should the Court not issue a TRO, Kottke Cattle has not shown that the balance of equities weighs in its favor, and Kottke Cattle has not demonstrated that it will likely succeed on the merits of its claims.  Before a district court may issue a TRO pursuant to rule 65 of the Federal Rules of Civil Procedure, the movant must make the same four showings as for a PI: (i) that the movant is likely to "suffer irreparable injury unless the injunction issues"; (ii) that "the threatened injury" to the movant if the court does not issue the preliminary injunction "outweighs whatever damage the proposed injunction may cause the opposing party"; (iii) that "the injunction, if issued, would not be adverse to the public interest"; and (iv) that "there is a substantial likelihood [of success] on the merits."  Resolution Trust Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992); See People's Trust Fed. Credit Union v. Nat'l Credit Union Admin. Bd., 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018)(Browning, J.); 13 Moore's Federal Practice ¶ 65.36(1), at 65-83 (3d ed. 2004).  First, Kottke Cattle has not shown that it would suffer irreparable injury unless the Court issues a TRO, because: (a) Kottke Cattle does not allege that its remaining cattle in possession of Zia Agricultural are anything other than a monetary investment for Kottke Cattle such that any underperformance of their investments because of the livestock's sale is not compensable adequately through damages; and (b) Kottke Cattle does not allege that Zia Agricultural is judgment-proof, insolvent, or otherwise will become unable to pay a judgment. Second, Kottke Cattle does not plead facts sufficient to persuade the Court that the threatened injury to Kottke Cattle of selling their cattle at auction outweighs the harm to Zia Agricultural of a TRO.  Third, it is not adverse to the public interest to enjoin the livestock's auction or to enjoin

Zia Agricultural from interfering with Kottke Cattle's recovery of its livestock.  Fourth, based on the facts asserted in its Complaint, the Court cannot determine whether Kottke Cattle has a likelihood of success on the merits of its State law claims.

**I.     KOTTKE CATTLE DOES NOT DEMONSTRATE THAT IT WILL SUFFER IRREPARABLE INJURY IF THE COURT DOES NOT ISSUE A TRO, BECAUSE <u>DAMAGES WOULD PROVIDE KOTTKE CATTLE ADEQUATE RELIEF</u>.**

The Court determines that Kottke Cattle will not suffer irreparable injury if the Court does not issue a TRO.  To succeed in its request for a TRO, a plaintiff must demonstrate that "remedies available at law, such as monetary damages, are inadequate to compensate for that injury," and "a remedy in equity is warranted" in light of "the balance of hardships between the plaintiff and defendant."   <u>eBay Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388, 391 (2006).   See <u>N. N.M. Stockman's Ass'n v. United States Fish & Wildlife Serv.</u>, 494 F. Supp. 3d 850, 1030 (D.N.M. 2020)(Browning, J.).   As with TROs, "[i]t is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is clear and unequivocal."  <u>Diné Citizens Against Ruining Our Env't v. Jewell</u>, No. CIV 15-0209 JB/SCY, 2015 U.S. Dist. LEXIS 109986, at *56 (D.N.M. Aug. 14, 2015)(Browning, J.)(citing <u>Kikumura v. Hurley</u>, 242 F.3d at 955), <u>aff'd</u> 839 F.3d 1276 (10th Cir. 2016).   "[I]rreparable injury" is "harm that cannot be undone, such as by an award of compensatory damages or otherwise."  <u>Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.</u>, 320 F.3d 1081, 1105 (10th Cir. 2003)(citing <u>Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.</u>, 805 F.2d at 355).

> As for irreparable harm: Normally the mere payment of money is not considered irreparable, see <u>Sampson v. Murray</u>, 415 U.S. 61, 90 (1974), but that is because money can usually be recovered from the person to whom it is paid. If expenditures cannot be recouped, the resulting loss may be irreparable.

<u>Philip Morris USA Inc. v. Scott</u>, 561 U.S. 1301, 1304 (2010)(Scalia, J.).

Kottke Cattle asserts that "the Defendants have shown a willingness, ability, and determination to hide important information from Kottke regarding its livestock and to relocate and misappropriate its cattle without notice to Kottke." TRO Motion at 4. Kottke Cattle argues that the "further damage" which Zia Agricultural will cause in the absence of a TRO "includes the imminent sale of the cattle and its offspring (both actual and potential) belonging to Plaintiff for an inferior price." TRO Motion at 4. Further, Kottke Cattle asserts that, "with the animals being perishable and subject to wide price variations over time, determining the proper disposition of the animals by sale at an advantageous time is paramount and the damage caused by sudden liquidation will be irreparable." TRO Motion at 4. Kottke Cattle adds that "Kottke would have no way of determining whether any of its cattle actually gave birth while in the possession and control of Zia or what the disposition of any cattle was, even if it was able to determine that it had been born." TRO Motion at 4. In addition, Kottke Cattle asserts that,

> given the fact that Zia itself claims no knowledge of the number of animals at issue and have manifested no interest in discovering that information, there would be no way for Kottke to know the true count, or to prevent Zia from altering that count by selling animals without notice to Kottke.

TRO Motion at 4. Kottke Cattle argues: "Allowing Kottke to regain possession of its cattle pending resolution of this matter would help to alleviate any such potential irreparable harm." TRO Motion at 4-5.

Kottke Cattle has not alleged that the remaining cattle in Zia Agricultural's possession from the Calf Programs are anything other than Kottke Cattle's monetary investment. See generally, Complaint ¶ 16, at 3-10; TRO Motion at 3-5. On the contrary, Kottke Cattle expected to see a financial return on its various investments with Zia Agricultural, which included: (i) $1.5 million in the Mexford Program, see Complaint ¶ 16(a), at 3; (ii) $1.2 million in the GY1 Program, see

Complaint ¶ 16(b), at 4; (iii) $1.8 million in the Source 2 program, see Complaint ¶ 16(c), at 5; (iv) $109,375.00 in the Clovis 1 program, see Complaint ¶ 16(d), at 6; and (v) an unspecified amount in the Calf Programs, see Complaint ¶ 16(e), at 7-10.  Kottke Cattle is not alleging that the sale or loss of the livestock itself will cause Kottke Cattle irreparable harm because of the loss of those particular cattle, as might have been the case were Kottke Cattle breeding rare species or had other specific interests in these particular animals.  While Kottke Cattle expresses concern that Zia Agricultural purchased "inferior Jersey/Angus calves" instead of "NHTC certified (for which a premium price is earned when sold) Holstein/Angus calves" as had been agreed, Complaint ¶ 16(c), at 5, this concern is about the lower monetary value of the breed Zia Agricultural substituted.  If Zia Agricultural bought inferior cattle, that ship has already sailed; there is nothing a TRO can do to remedy that problem.  Kottke Cattle's concern that it will not be able to determine the number of cattle and calves in its inventory if the Calf Program cattle are auctioned, see TRO Motion at 4, does not convert the appropriate remedy from a legal to an equitable one.  Kottke Cattle does not explain why it cannot send someone incognito to investigate and find out information about the cattle sale.  A TRO is not needed to procure evidence or information; good old gumshoe investigation work can get that evidence better than a TRO.

Despite Kottke Cattle's solely financial interest in the livestock, "if expenditures cannot be recouped, the resulting loss may be irreparable."  Philip Morris USA Inc. v. Scott, 561 U.S. at 1304 (2010).  Although Kottke Cattle alleges that Zia Agriculture has breached their contract, breached its duty of good faith and fair dealing, breached its fiduciary duty, and engaged in fraud, conversion, and embezzlement, Kottke Cattle does not allege that Zia Agriculture is insolvent, judgment-proof, or otherwise unable to pay an award of damages.  See Complaint ¶¶ 41-79, at 13-16.  If Kottke Cattle can recoup a judgment of damages after trial, equitable relief is not

appropriate.  The Court concludes, therefore, that because damages will provide Kottke Cattle

adequate relief, Kottke Cattle will not suffer irreparable injury if the Court does not issue a TRO.

## II.    KOTTKE CATTLE DOES NOT PLEAD SUFFICIENT FACTS TO EXPLAIN WHY THE THREATENED INJURY TO KOTTKE CATTLE OUTWEIGHS THE DAMAGE A TRO WOULD CAUSE ZIA AGRICULTURAL.

The Court concludes that Kottke Cattle does not give sufficient information for the Court

to determine whether the threatened injury to Kottke Cattle of Zia Agricultural auctioning off

Kottke Cattle's remaining livestock outweighs the harm that such an injunction may cause Zia

Agricultural.   Kottke Cattle alleges that "[s]ale by auction of all these animals is not a

commercially appropriate manner of sale, and is certain to result in a lower price for the animals

than would be achieved by Kottke if allowed to negotiate with potential buyers of its animals."

Complaint ¶ 39, at 12.  Kottke Cattle does not offer any further information, however, about why

auctioning these cattle would fetch a price below their market value.  Kottke Cattle also argues

that "[t]he balance of hardships will usually weigh in favor of the plaintiff if the status quo is

preserved and if they are not seeking the full relief requested in her complaint."  TRO Motion at 5

(citing Phillip v. Fairfield Univ., 118 F.3d 131, 133 (2nd Cir. 1997)).  Nevertheless, maintaining

the status quo does not necessarily mean that Zia Agricultural will suffer less harm than Kottke

Cattle in this instance.  Even though Kottke Cattle is willing to deposit a bond for the full amount

Zia Agricultural asserts is disputed, the Court lacks sufficient information about Zia Agricultural's

position to balance the equities in this case.  See TRO Motion at 5-6.  The Court concludes,

therefore, that Kottke Cattle does not meet its burden on the second prong of the test.

III.     **A TRO PREVENTING ZIA AGRICULTURAL FROM AUCTIONING KOTTKE'S CATTLE WOULD LIKELY NOT BE ADVERSE TO THE PUBLIC INTEREST.**

The Court concludes that preventing Zia Agricultural from auctioning Kottke's Cattle would not be adverse to the public interest.  Neither Kottke Cattle nor Zia Agricultural appear to have such vast holdings of cattle that withholding them from auction or even from the market pending this dispute would harm the public: while the number of cattle Kottke Cattle asserts are remaining in Zia Agricultural's possession from the Calf Programs is unknown, see TRO Motion at 4, the numbers Kottke Cattle quotes in its Complaint for other programs are: 2,004 HD for the Mexford Program, see Complaint ¶ 16(a), at 3; 1,541 HD for the GY1 program, see Complaint ¶ 16(b), at 4; and 2,000 HD for the Source 2 program, see Complaint ¶ 16(c), at 5.  It is unlikely that withholding similar numbers of cattle from the market pending this dispute's resolution would be adverse to the public interest.  As stated above, however, this finding does not help Kottke Cattle prevail in its request for a TRO where damages are an appropriate and adequate remedy.

IV.     **KOTTKE CATTLE HAS NOT INCLUDED ENOUGH FACTS IN ITS COMPLAINT FOR THE COURT TO DETERMINE WHETHER KOTTKE CATTLE IS LIKELY TO SUCCEED ON THE MERITS OF ITS STATE LAW CLAIMS.**

Based on the facts asserted in its Complaint, the Court cannot conclude whether Kottke Cattle is likely to succeed on the merits of its State law claims.  Because this is a diversity case, the Court applies New Mexico substantive law.  See Butt v. Bank of Am., N.A., 477 F.3d at 1179.  Kottke Cattle lists ten counts for relief in its Complaint: breach of contract, breach of the duty of good faith and fair dealing, breach of fiduciary duty, fraudulent misrepresentation, conversion, embezzlement,[7] unjust enrichment, accounting, declaratory judgment, and injunctive relief.  See

_____

[7]The Court cannot find a civil remedy for embezzlement in New Mexico: New Mexico has Uniform Jury Instructions on the criminal elements for embezzlement, see N.M.R.A. 14-1641, but

Complaint ¶¶ 14-106, at 13-18.  Under New Mexico law, "[t]he elements of a breach-of-contract action are the existence of a contract, breach of the contract, causation, and damages."  Abreu v. N.M. Children, Youth and Families Dep't, 797 F. Supp. 2d 1199, 1247 (D.N.M. 2011)(Browning, J.).

> [A] complaint on breach of contract must allege: (1) the existence of a valid and binding contract; (2) the plaintiff's compliance with the contract and his performance of the obligations under it; (3) a general averment of the performance of any condition precedent; and (4) damages suffered as a result of defendant's breach.

McCasland v. Prather, 1978-NMCA-098, ¶ 7, 585 P.2d 336, 338.  While it is possible that the parties have a valid, binding contract, the facts in Kottke Cattle's Complaint are not sufficiently detailed for the Court to make this determination.  Kottke Cattle has not shown the Court its written contract with Zia Agricultural, if there is one, nor has it offered facts in sufficient detail for the Court to make a determination about the terms of a contract.  Kottke Cattle also does not show sufficient facts for the Court to conclude whether Zia Agricultural, N. Perez, or S. Perez, acted as "investment advisors," see Complaint ¶ 54, at 14, or agents, and therefore owed Kottke Cattle a fiduciary duty or a duty to account for investments.  As a result, the Court cannot determine whether Kottke Cattle would likely succeed on its breach of contract, breach of the duty of good faith and fair dealing, accounting, or breach of fiduciary duty claims.

Likewise, Kottke Cattle does not plead sufficient facts for the Court to determine whether Kottke Cattle has a substantial likelihood of success on the merits of its fraudulent misrepresentation claim.  Under New Mexico law, the elements of fraudulent misrepresentation

---

it does not have an equivalent civil jury instruction on embezzlement.  The analysis of whether there is an implied cause of action for embezzlement in New Mexico would take more time than the Court has to respond to this TRO Motion.

are: "(i) a misrepresentation of fact, (ii) either knowledge of the falsity of the representation or recklessness on the part of the party making the misrepresentation, (iii) intent to deceive and to induce reliance on the misrepresentation, and (iv) detrimental reliance on the misrepresentation." Pedroza v. Lomas Auto Mall, Inc., 600 F. Supp. 2d 1162, 1167 (D.N.M. 2009)(Browning, J.)(quoting Cain v. Champion Window Co., 2007-NMCA-085, ¶ 22, 142 N.M. 209, 216, 164 P.3d 90, 97). See Encinias v. Whitener Law Firm, P.A., 2013-NMSC-045, ¶ 22, 310 P.3d 611, 620. Furthermore, pursuant to rule 9(b) of the Federal Rules of Civil Procedure, when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). While Kottke Cattle asserts that Zia Agricultural "made representations of fact to Kottke which were not true," including that Zia Agricultural "had an unblemished history of profitable cattle investing," "possessed special relationships in the cattle industry," or "would always act in the best interests of Kottke's investments," the Court lacks sufficient information to know whether these statements were false, whether Zia Agricultural knew they were false, and to what extent they were relied upon by Kottke Cattle. Complaint ¶ 59, at 14.

Similarly, without knowing more about the agreement in place between the parties, the Court cannot determine whether Kottke Cattle's conversion claims will likely succeed on the merits.

> To prove conversion, a plaintiff must show one of three situations: "the unlawful exercise of dominion and control over personal property belonging to another in exclusion or defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made."

Ortiz v. N.M. Dep't of Cultural Affairs, No. CIV 16-1396 JB/JHR, 2018 U.S. Dist. LEXIS 2536, at *12 (D.N.M. Jan. 5, 2018)(Browning, J.)(citing Muncey v. Eyeglass World, LLC, 2012-NMCA-

120, ¶ 22, 289 P.3d at 1262).  As part of the Clovis 1 Program, Kottke Cattle paid Zia Agricultural

$109,375.00 for a shipment of semen, but did not receive any resulting cattle.  See Complaint ¶

16(d), at 6-7.  Additionally, Kottke Cattle also claims that N. Perez sold Kottke Cattle's 2019 crop

from the Calf Programs and N. Perez kept the profits.  See Complaint ¶ 16(e), at 7-8.  Whether or

not these events amounted to conversion may depend on the nature of the parties' agreement, and

the circumstances surrounding those losses.   Without further information, the Court cannot

conclude that Kottke Cattle will likely succeed on the merits of its conversion claim.

So too does the success of Kottke Cattle's unjust enrichment claim depend on the nature

of the agreement or contract between the parties.  "To prevail in unjust enrichment, 'one must

show that: (1) another has been knowingly benefitted at one's expense (2) in a manner such that

allowance of the other to retain the benefit would be unjust.'"  City of Rio Rancho v. Amrep Sw.

Inc., 2011-NMSC-037, ¶ 54, 150 N.M. at 442-43, 260 P.3d at 428-29 (quoting Ontiveros

Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 129 N.M. at 203, 3 P.3d at 698).   Equitable

claims are typically unavailable if there is an adequate remedy at law.  See Gen. Tel. Co. of the

Sw. v. State Tax Comm'n, 1962-NMSC-005, ¶ 19, 69 N.M. at 408, 367 P.2d at 715; Sims v. Sims,

1996-NMSC-078, ¶ 32, 122 N.M. at 624, 930 P.2d at 159 ("[E]quity will not act if there is a

complete and adequate remedy at law.")(quoting S.P.C.S., Inc. v. Lockheed Shipbuilding &

Constr. Co., 631 P.2d at 1001).  Because the Court does not know what terms the parties agreed

to, it cannot determine whether any gains made by Zia Agricultural, N. Perez, or S. Perez, were

unjust.  In sum, the Court cannot conclude based on the facts in the Complaint that Kottke Cattle

will likely prevail on the merits of its State law claims.  As a result, because Kottke Cattle's request

for a TRO fails the fourth prong -- in addition to the first and second prongs -- of the test, the Court

will deny Kottke Cattle's request for an ex parte TRO.

**IT IS ORDERED** that: (i) Kottke Cattle's request for a TRO in Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction, filed October 15, 2021 (Doc 2 (Ex Parte)), is denied; and (ii) the hearing on the PI is set for Tuesday, October 26, 2021, at 10:00 a.m.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Alicia M. McConnell
Donald Kochersberger
Business Law Southwest LLC
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*